NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1345
_____

KYMBERLEY COLE ROSENCRANS,
Appellant

v.

QUIXOTE ENTERPRISES, INC., d/b/a Adult World; CHARLES ERIC MORROW
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-17-cv-00055)
District Judge: Honorable Richard P. Conaboy
_____

Submitted Under Third Circuit LAR 34.1(a)
November 2, 2018

Before: CHAGARES, JORDAN, and VANASKIE, *Circuit Judges.*

(Filed: November 27, 2018)
_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

Kymberley Cole Rosencrans appeals the grant of summary judgment for Quixote

Enterprises, Inc. ("Quixote") and Charles Eric Morrow (collectively, the "Defendants")

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

on her employment discrimination claims. For the reasons that follow, we will vacate and remand.

## I.   BACKGROUND

In 2015, Rosencrans was hired to be a district manager at Quixote, an adult entertainment business. Morrow is the part-owner and, as he has said, the "boss" of Quixote who "make[s] the major decisions that need to be made" at the company. (App. at 164.) Prior to her employment with Quixote, Rosencrans worked as Morrow's housecleaner.[1]  During that time, she and Morrow developed a friendship, which, in May 2015, led to their having sex. After that one-time encounter, the two remained on good terms.

In the fall of 2015, Rosencrans and Morrow discussed having Rosencrans begin work at Quixote. She asserts that Morrow complained to her about problems with one of his district managers and that she told him "she'd be willing to do the job." (App. at 130.) The Defendants counter that Rosencrans pestered Morrow to hire her and he finally relented and allowed her to apply, despite having serious reservations about her ability to adequately fill the position. He was particularly concerned that she would have trouble commuting for an hour and a half and being available on an emergency basis, because Rosencrans was a single mother with four children.

---

[1] Rosencrans began cleaning Morrow's house in 2008. At some point between 2008 and 2015, Rosencrans stopped doing that. The parties dispute when that occurred and why. The details of that dispute, however, are not relevant to the issues on appeal. It is uncontested that, by April 2015, Rosencrans had resumed cleaning Morrow's house.

Nonetheless, Morrow decided to hire Rosencrans as a district manager. After he informed Quixote's office manager, Sharon Greco, and Quixote's Controller, Larry Schemery, of that decision, Greco and Schemery met with Rosencrans to complete required paperwork and review her job duties. Rosencrans received a copy of the Quixote employee handbook, which contains an at-will employment provision and a provision specifying that an employee's first three months at the company are an "evaluation period." (App. at 106-07.)

On November 9, 2015, Rosencrans began her employment with Quixote. The parties disagree about much of what happened over the next eleven days –the entirety of Rosencrans's tenure at the company. For example, the Defendants assert that Rosencrans failed to show up for work on Veterans' Day, played on her personal computer during work hours, and refused to attend training in Syracuse, New York. Rosencrans says all of that is false.

What is undisputed, however, is that on Sunday, November 15, Rosencrans flew to Las Vegas and got married. Four days later, on Thursday, November 19, she sent Morrow a text with that news. The next day, she was fired.

Before she learned of her firing, she had sent Morrow another text, this one asking whether she would have a company car in time for her training in Syracuse. Morrow responded, "Change of plans… [T]alk to Larry [Schemery] in the office." (App. at 228.) Rosencrans called Schemery, who told her she "wasn't working out and … they were giving the other girl a chance, and they would call [her] if that didn't work out." (App. at 152.) After the call, Rosencrans and Morrow exchanged a series of texts, in the course of

3

which Morrow told Rosencrans, "Ur just not working out and I gave the other girl another chance… U have a [manager] job at the bar and a new husband…." (App. at 228.)

Despite Morrow's text, which appears to take responsibility for the decision to give another woman the district manager position, the Defendants maintain that it was Schemery, not Morrow, who decided to fire Rosencrans. According to the Defendants, Morrow had asked Schemery and Greco to "[l]eave [him] out of" all decisions involving Rosencrans's employment. (App. at 196.) It was thus Schemery who terminated Rosencrans, and, in the Defendants' telling, he did so because of her lateness, personal computer use, and "general poor attitude." (App. at 53.) Greco testified that while Schemery and Greco did, in fact, "run [the firing decision] by Morrow," they were not required to do so. (App. at 89.) And, when they asked for permission to discharge her, Morrow told them, "[D]o what you have to do." (App. at 89.)

In January 2017, Rosencrans filed suit against Quixote and Morrow in the United States District Court for the Middle District of Pennsylvania, alleging against Quixote violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), for quid pro quo and disparate treatment sex discrimination, and against Morrow a violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"), for aiding and abetting sex discrimination.

The Defendants moved to dismiss the complaint in its entirety. The District Court granted that motion as to the quid pro quo sex discrimination claim against Quixote but denied it as to the other claims. The Defendants eventually moved for summary

4

judgment on Rosencrans's remaining claims, and the Court granted that motion, concluding that Rosencrans had failed to establish a prima facie case of discrimination. Rosencrans timely appealed.

## II.    DISCUSSION[2]

Rosencrans asserts that the District Court erred in granting summary judgment on her disparate treatment and aiding and abetting sex discrimination claims. We agree, because there is a genuine issue of material fact as to whether discriminatory animus motivated her firing.

The familiar *McDonnell Douglas* burden-shifting analysis applies to Rosencrans's discrimination claims under Title VII and the PHRA.[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, Rosencrans bears the initial burden of establishing a prima facie case of discrimination. *Id.* at 802-03. If she can do so, the burden of production shifts to the Defendants "to articulate some legitimate, nondiscriminatory reason" for her firing. *Id.* at 802. If the Defendants carry that burden, Rosencrans must then come forward with evidence that the legitimate reason offered by

---

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo and "view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party." *Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010) (citation omitted). "Summary judgment is appropriate where the [c]ourt is satisfied 'that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citation omitted). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3] Insofar as claims of the kind here are concerned, the PHRA is interpreted to be coextensive with Title VII. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

5

them was merely a pretext for discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

To establish a prima facie case of gender discrimination under a disparate treatment theory, Rosencrans must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of intentional discrimination. *See Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Her prima facie burden is not "onerous." *Burdine*, 450 U.S. at 253. "[W]e have repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances….'" *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)).

The first three elements are not in dispute. Rosencrans, a female, is a member of a protected class; there is no contention that she was not qualified for her position; and she was fired from Quixote. The District Court granted summary judgment based on the fourth element, concluding that Rosencrans had failed to make a prima facie showing that her termination occurred under circumstances giving rise to an inference of sex discrimination. Rosencrans rightly contends that that was error.

A Title VII claim premised upon marital status raises "what has come to be known as a 'sex-plus' problem," which "arises whenever an employer adds a criterion or factor for one sex (e.g., marital status), which is not added for the other sex." *Bryant v. Int'l Sch. Servs., Inc.*, 675 F.2d 562, 573 & n.18 (3d Cir. 1982) (citation omitted). In a "sex-

6

plus" case like this, the plaintiff must show that her employer treated married women "in a manner which 'but for [that person's] sex would . . . be[] different.'" *Id.* at 575 (quoting *City of L.A. Dep't of Water v. Manhart*, 435 U.S. 702, 711 (1978)). A plaintiff meets that burden by putting forth evidence showing she was treated less favorably than similarly situated men or through evidence of other circumstances, such as impermissible stereotyping, that gives rise to an inference of gender discrimination. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 121 (2d Cir. 2004).

Here, Rosencrans has put forth sufficient evidence for a prima facie showing that her discharge occurred under circumstances giving rise to an inference of impermissible discrimination. For example, in response to Rosencrans's text messages questioning her firing, Morrow texted back, "U have ... a new husband." (App. at 228.) When asked at his deposition why he included that fact in his response, Morrow testified, "Because she just got married…. She's not my problem…. It's not my job to support that girl. It is not my job…. Let him take care of her." (App. at 181.) While the District Court credited this as evidence of impermissible stereotyping on Morrow's part, it nonetheless concluded that Rosencrans's claim failed because she could not show that Morrow was the decisionmaker behind her firing or that Schemery and Greco shared Morrow's views.

That conclusion, however, overlooks evidence from Rosencrans that Morrow may well have been the decisionmaker. Notably, after Rosencrans was fired, Morrow described the decision in personal terms, explaining, "I gave the other girl another chance…." (App. at 228.) While Morrow testified that he does not "hire and fire people," the evidence here can be viewed otherwise. (App. at 164.) Morrow was

7

apparently the one who hired her,[4] and his later text message can be read as taking responsibility for replacing her. In addition, regardless of whether Schemery and Greco were required to get Morrow's permission to fire Rosencrans, it is not disputed that they did seek his permission. And, of significance, there is a very close temporal proximity – a single day – between when Rosencrans told Morrow she had gotten married and her termination. *See Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) ("Cases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." (quotation marks and citation omitted)). Taking all of the evidence in the light most favorable to Rosencrans, there is sufficient evidence connecting her firing to impermissible discrimination to establish the requisite prima facie case under both Title VII and the PHRA.[5]

---

[4] As the Defendants describe Rosencrans's hiring, "Morrow reluctantly agreed to let Rosencrans apply and see if it would work out…" (App. at 50.) But Quixote's employees testified that Morrow was the one who hired her and "sent her over" to them to discuss her job duties and pay, having already offered Rosencrans the position. Rosencrans says Morrow offered her the district manager position. Based on that record, it can be fairly understood that Morrow hired Rosencrans.

[5] The Defendants argue that Rosencrans has failed to put forward sufficient comparator evidence to make out a prima facie case. She counters that, in a response to a request for admission, the Defendants' "admission" that "Defendants Quixote and Morrow never fired anyone, male or female, because they were married or became married during their employment with Quixote" is sufficient to show that she was treated less favorably than similarly situated males. (App. at 244.) We do not have to decide whether the Defendants' discovery answer constitutes comparator evidence because, as

In short, we conclude that the District Court erred in granting summary judgment on Rosencrans's Title VII and PHRA claims because there are yet factual disputes to resolve about whether she would have been terminated absent her marriage.

## III.  CONCLUSION

For the foregoing reasons, we will vacate the summary judgment order and remand for further proceedings.

---

the District Court rightly noted, such evidence is not the only way to satisfy the fourth prong.  *Back*, 365 F.3d at 121.